# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DARLENE SCHUSTER,**

                        **Plaintiff,**

-vs-                                                    **Case No.  6:06-cv-1451-Orl-UAM**

**COMMISSIONER OF SOCIAL
SECURITY,**

                        **Defendant.**
_____

# MEMORANDUM OF DECISION

        Plaintiff Darleen R. Schuster ["Schuster"] appeals to the district court from a final decision

of the Commissioner of Social Security [the "Commissioner"] denying her application for a period

of disability and disability insurance benefits.  Doc. No. 1.  For the reasons set forth below, the

Commissioner's decision is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      PROCEDURAL HISTORY

        On November 5, 2003, Schuster protectively filed a claim for disability insurance benefits,

claiming disability as of May 19, 2003 due to pain and weakness in her legs and back, degenerative

disc disease, supraventricular tachycardia, inflammatory soft tissue syndrome, and an affective

disorder.  R. 14, 59-61, 73.  Her claim for benefits was denied initially and upon reconsideration.  On

January 17, 2006, the Honorable Arthur Conover, Administrative Law Judge ["ALJ"], held a hearing

on Schuster's claim by video teleconference.  R. 520-43.  The ALJ conducted the hearing from

Charleston, West Virginia.  R. 522.  Schuster and her attorney Robert McCall attended the hearing in

Melbourne, Florida.  *Id.*  The ALJ heard testimony from Schuster and Cecilia Thomas, an impartial

vocational expert ["VE"].  R. 521.  The VE testified from Charleston, West Virginia.  R. 522.

On March 27, 2006, the ALJ issued a decision that Schuster was not disabled and not entitled

to benefits.  R. 11-18.  The ALJ first found that, although Schuster alleged disability as of May 19,

2003, she worked as a cake decorator for eight hours per day and forty hours per week until October

9, 2003, and, as a result, the ALJ found her "not disabled" from May 19, to October 9, 2003.[1]  R. 12;

*see also* R. 74.  Next, following a review of the medical and other record evidence, the ALJ concluded

that Schuster retained the residual functional capacity ["RFC"]:

> to perform work at the light exertional level.  Light work involves occasionally
> lifting/carrying [of] up to twenty pounds and frequently lifting/carrying of up to ten
> pounds.  She requires a sit/stand option at will.  She must avoid extended walking at
> the job site.  She can occasionally climb ramps and stairs with hand rails, occasionally
> stoop, and occasionally crouch.  She can never balance, kneel or crawl.  She requires
> indoor work.  She most (sic) avoid concentrated exposure to extreme cold or heat or
> humidity.  She must avoid exposure to heights, hazards or dangerous machinery.  She
> requires simple routine work instructions.

R. 15.  In the formal findings, the ALJ stated his RFC finding differently.  The ALJ found that

Schuster could not perform her past relevant work, R. 18, Finding 8, but that Schuster retained the

RFC:

> to perform work at the light exertional level.  Light work involves occasionally
> lifting/carrying [of] up to twenty pounds and frequently lifting/carrying of up to ten
> pounds.  The claimant is limited from climbing ladders, ropes or scaffolds; balancing;
> kneeling[;] and crawling.  She can occasionally climb ramps and stairs with hand rails;
> occasionally stoop, and occasionally crouch.  She requires indoor work and is limited
> from hazardous work sites.  She must avoid concentrated exposure to extreme cold,
> extreme heat, and high humidity.  She does experience pain and discomfort on a
> regular basis.  Her concentration limits her to only simple, routine work instructions
> without attention to detail.

---

[1]Schuster did not claim error as to this issue on appeal.

R. 17-18, Finding 7.  The ALJ also made a separate finding that "[f]rom October 10, 2003 to the present, [Schuster] has the [RFC] to perform a significant range of light work . . ." R. 18, Finding 12. After hearing testimony by the VE, the ALJ found that Schuster could perform work as a cashier, a packager, and a job in "assembly/production."  *Id.*, Finding 13.  The ALJ therefore concluded that Schuster was not disabled.  *Id.*, Finding. 14.

On August 25, 2006, the Appeals Council denied review.  R. 5, 8.  On September 21, 2006, Schuster timely appealed the Appeals Council's decision to the United States District Court.  Doc. No. 1.  On January 29, 2007, Schuster filed in this Court a memorandum of law in support of her appeal. Doc. No. 9.  On March 29, 2007, the Commissioner filed a memorandum in support of his decision that Schuster was not disabled.  Doc. No. 10.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Schuster assigns two errors to the Commissioner.   First, Schuster claims that the Commissioner erred in by not assigning controlling weight to the opinion of Dr. Christopher Nunes, Schuster's treating physician.  Doc. No. 9 at 1.  Second, Schuster claims that the Commissioner erred by failing to follow Social Security Ruling 96-7 in evaluating Schuster's credibility.  *Id.*

The Commissioner argues, overall, that substantial evidence supports his decision to deny disability.  The Commissioner responds by arguing that Schuster's complaints were not credible; that the opinion of Dr. Nunes was largely based on Schuster's subjective complaints; and that, accordingly, the ALJ did not err by rejecting the treating physician's opinions or by finding Schuster not entirely credible.  Doc. No. 10 at 6.

## III.    THE STANDARD OF REVIEW

**A.       AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g.  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991.  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied.

**B.       REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990. This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984. A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985.

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996. To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled.

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment.   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation.   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.[2]

## IV.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Schuster was born on February 13, 1959 and was forty-six years old on the day of the ALJ issued his decision to deny benefits.  R. 11, 82.  Schuster completed the tenth grade, and she has past work experience as a cake decorator.  R. 79, 86, 90.

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Schuster intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

On May 29, 2003, Christopher Prusinski, D.C., performed a neurologic evaluation. R. 346-68. Schuster complained of low back pain with radiation to her lower extremities, and stated that she was experiencing numbness and tingling in her lower extremities and feet. R. 346. On examination, Dr. Prusinski noted lumbar spinal muscle spasms and tenderness with palpation, and he diagnosed low back pain due to lumbar and sacroiliac joint somatic dysfunction and lumbar strain, and "Physical/activity dependent radiculopathy." R. 348. Dr. Prusinski recommended that Schuster apply moist heat or cold and modify her daily activities, and that she seek chiropractic treatment "which is medically necessary." *Id.* He also gave Schuster a "TTD [Temporarily Totally Disabled] note until 6-29-03," and scheduled a bone scan for Schuster. *Id.*

Schuster sought treatment with Dr. Prusinski approximately once a month from June 19 through December 17, 2003, R. 335-43, and then for several more visits between February and April 2005. R. 319-34. On June 19, 2003, Schuster complained of "constant, severe, increased low back pain with radiation to the lower extremities bilaterally along with stiffness." R. 343. Schuster also reported that she had scheduled epidural injections for the following day, and that she continued to receive chiropractic treatment. *Id.* The examination revealed "no additional neurologic symptoms" and no changes since her last examination. *Id.* Dr. Prusinski prescribed Darvocet for the the pain, and directed Schuster to discontinue taking Percocet. *Id.* He also advised her to continue her current treatment plan. *Id.*

X-rays from May 4, 2003 were normal and revealed no degenerative changes in Schuster's lumbosacral spine. R. 195. Schuster underwent steroidal epidural injections on June 20, 2003, June 23, 2003, and July 1, 2003. R. 196-200. On June 30, 2003, Schuster was admitted to the Cape

Canaveral Hospital emergency room for heart palpitations.  R. 178-92.  Schuster had an elevated thyroid level, and the diagnosis was supraventricular tachycardia[3] with a secondary diagnosis of hypothyroidism.[4]  R. 186, 189.  Schuster was observed at the hospital and then discharged the same day.  R. 179-92.

On July 2, 2003, Christopher Scott Nunes, M.D., examined Schuster.  R 369-370.  Schuster had previously sought treatment with Dr. Nunes' partner for pain her in legs and her difficulty walking.  R. 369.  Schuster stated that since her last epidural injection, she had been experiencing pain in her sacrum and that she found it difficult to sit.  *Id.*  Schuster was able to walk, although she had weakness.  *Id.*  During the examination, Dr. Nunes observed that Schuster sat in a chair "somewhat uncomfortably tilted to one side on a pillow."  *Id.*  He also observed that she moved "somewhat slowly and appears to be in discomfort or mild pain with movement."  *Id.*  On examination, Schuster had no tenderness over the lumbar or paralumbar region, but she could not "lay down flat, [but she had] to first tilt toward her side and the roll over to her back."  *Id.*  Her strength was 5/5 with a normal gait.  R. 370.  Dr. Nunes' impression was that Schuster's most critical issue was her recent supraventricular tachycardia and abnormal thyroid.  *Id.*  He further stated that "[h]er back pain, leg pain and leg weakness appear to be related.  She has a dramatically elevated ANA levels[5] suggesting an underlying autoimmune connective tissue or rheumatologic[6] disorder."  R. 370.  Dr. Nunes ordered further testing

---

[3]"Supraventricular tachycardia"is defined as a "rapid heart rate due to a pacemaker anywhere above the venitrcular level."  STEDMAN'S MEDICAL DICTIONARY 1758 (26th ed. 1995) ["STEDMAN'S"].

[4]"Hypothyroidism"is defined as the "[d]iminished production of thyroid hormone . . ."  STEDMAN'S at 841.

[5]"ANA" is an abbreviation for "antinuclear antibody."  STEDMAN'S at 68.

[6]"Rheumatism" is an "[i]ndefinite term applied to various conditions with pain or other symptoms of atricular origina or related to other elements of the musculoskeletal system."  STEDMAN'S at 1543.

-8-

and a referral to a rheumatologist. *Id.* On July 16, 2003, Schuster returned to Dr. Nunes for a follow-up appointment. R. 368. The doctor's impression was "back, lower extremity pain and weakness." *Id.* Schuster's thyroid and EKG studies were unremarkable. *Id.* Dr. Nunes referred her for further evaluation with a rheumatologist and treatment of her suspected connective tissue disease. *Id.* He also stated:

> She is not presently able to work because of the discomfort and weakness. I have filled out a long-term disability for her today stating a moderate impairment and occupational function is limited (sic) in performance and some occupational duties which may need to be upgraded to major impairment depending on how her course of evaluation and therapy proceed from Dr. Sacks upon rheumatology referral.

*Id.*

On July 21, 2003, Schuster was examined by rheumatologist Disa Sacks, M.D., for symptoms of increasing fatigue and pain in her arms, legs and back. R. 212. A lower extremity examination revealed bilateral knee effusions, and Dr. Sacks noted that Schuster displayed a delayed relaxation phase of her deep tendon reflexes in her lower and upper extremities. *Id.* Dr. Sacks also noted symptoms of hypothyroidism, and stated that hypothyroidism could be the cause of all of Schuster's symptoms. *Id*. Dr. Sacks prescribed medication; referred Schuster to another doctor for examination and treatment of "why she might by hypothyroid"; but stated that Schuster would not need a long-term rheumatologist. *Id.*

On August 7, 2003, Schuster saw Dr. Prusinski who noted no interval changes since his last examination. R. 341. Schuster continued to complain of pain and having difficulty walking. *Id.* He recommended a rheumatologic re-evaluation as "medically necessary," and gave Schuster a "TTD until 9-7-03."

In August and September 2003, Schuster underwent a series of examinations and tests at the Mayo clinic of Jacksonville.  R. 216-40.  On August 26, 2003, Schuster was examined by Francois Lette, M.D., an internal medicine physician at the Mayo clinic.  R. 239-40.  On examination, Schuster was unable to hop on either foot; she could not walk on her heels or toes; and she had limited range of motion in her upper extremities and limited flexion at the waist.  R. 239.  Her reflexes were "absent in both ankles."  *Id.*  In the "assessment and plan" portion of the notes, the doctor described Schuster as a "pleasant, 44 year-old lady with four months of fatigue and back pain radiating to her ankes," and noted that Schuster had "an unsteady gait."  R. 239.  Dr. Lette referred Schuster for rheumatologic and neurologic evaluations.  R. 240.

An August 27, 2007 EMG of the right lower extremity was normal.  R. 236.  On the same day, Schuster was examined by rheumatologist Marc Cohen, M.D., at the Mayo clinic for her back pain and weakness.  R. 233-235.  Dr. Cohen noted that on examination, Schuster walked into the examination room "with great difficulty."  R. 234.  She also "appear[ed] to have proximal muscle weakness [in] trying to arrange herself on the examination room table" and also "appear[ed] to have considerable lower extremity muscle weakness, proximal more than distal but both."  *Id.*  Dr. Cohen diagnosed "apparent lower extremity weakness" and back pain.  *Id.*  Dr. Cohen further stated:

> I am confused by what on examination appears to be weakness with a normal EMG and normal muscle enzymes.  I had my colleague, William W. Ginsburg, M.D., Division of Rheumatology/Internal Medicine, examine the patient as well, and he also thinks she is weak . . . .  Without a cause, I have difficulty deciding on treatment.  If her situation is confirmed as weakness, then a muscle biopsy will be critical to look for inflammation before initiating treatment.  For now, she will use Darvocet-N 100, which already has been given, as a mild analgesic to help her get through her days.

R 235.

-10-

On August 29, 2003, Schuster was examined by neurologist William P. Cheshire, M.D., at the Mayo clinic, for Schuster's reported worsening pain and weakness. R. 229-31. Schuster described her pain as worse when she walked, and stated that she could only walk 100 to 200 feet before "the pain reaches such an intensity that she is exhausted and must sit down." R. 229. Dr. Cheshire also observed that Schuster "has seen nine physicians so far but is still in search of a diagnosis." *Id.* Dr. Cheshire observed that Schuster's extremity muscles were normal in bulk and tone, but that she had "a markedly abnormal gait with a wide base and waddling posture titling her trunk to the left and right with each step." R. 230. Further, individual muscle testing showed that Schuster "barely ha[d] anti-gravity strength in all lower extremity muscle; yet, when asked to stand on her toes or heels, with encouragement, she [was] able to do so." *Id.* Dr. Cheshire assessed an "[u]nusual and progressive syndrome of diffuse lower extremity pain and weakness and profound gait difficulty." *Id.* He also expressed confusion at Schuster's test results, stating that her diminished ankle jerks upon examination suggested the possibility of a lower motor neuron lesion, but that a lesion sufficient to cause Schuster's profound weakness should have been detectable by the EMG testing. *Id.* He scheduled Schuster for an MRI of her entire spine and a follow-up appointment. R. 230-31.

An MRI of the cervical spine dated August 29, 2003 showed mild bulging discs at C4-5, C5-6 and C6-7 with a "suspected" small osteophyte or bony protrusion at C3-4. R. 241. An MRI of thoracic and lumbar spine from the same date suggested "inflammatory soft tissue process" of both areas. *Id.* The lumbar spine MRI also showed enhancement of the right S1 nerve root to the S1 level, which suggested radiculitis. *Id.* The MRI's of the spine did not show any other significant abnormalities. *Id.*

On September 2, 2003, Schuster was examined by Gudni Thorsteinsson, M.D., a physical medicine and rehabilitation physician at the Mayo clinic. R. 226-27. Schuster complained of pain and weakness, and stated that she had recently begun to use a wheelchair for mobility. R. 227. She also reported that over the previous four months, if she had a drink of alcohol, her face would turn red and burn, as if from a sunburn. *Id.* On examination, Dr. Thorsteinsson observed that Schuster had "to push with her hands to get up," and that she was unable stand on her toes or heels "because of weakness." *Id.* Dr. Thorsteinsson diagnosed "generalized weakness," low back and lower extremity pain, an unusual reaction to alcohol, a history of endometrial cancer in 1980, and an abnormal MRI of the thoracic and lumbar spine. R. 228. The doctor also stated:

> At this point, I would only recommend that the patient see the physical therapist for gentle stretching and range of motion of the shoulders and lower extremities with only a few repetitions and avoid any exhaustion or increased pain. The patient will have to consider using a wheelchair more for mobility. I told her that she should not be driving because of her significant weakness.

R 228.

A September 26, 2003 MRI of the pelvis showed results that "could represent degenerative changes." R. 243. The results were consistent with tendinopathy and left trochanteric bursitis. *Id.* Atrophy of the gluteus minimus and medius was possibly representative of an old partial tear. *Id.*

On October 2, 2003, Dr. Cheshire again examined Schuster. R. 221-22. Schuster reported a slight improvement on her exercise program, but stated that her ambulation was "still quite limited" due to weakness and tingling. R. 221. The doctor noted that additional testing was "unrevealing," and stated:

> Comprehensive neurologic examination is repeated today and is essentially the same as recorded a month ago. [Schuster] has moderate to severe weakness throughout the

-12-

> lower extremities, slightly brisk reflexes yet nearly absent at the ankles.  Radicular
> stretch signs are positive.  Her gait is somewhat waddling and appears to be antalgic
> more than anything else.  She is b[are]ly able to rise from her seat without using her
> hands.

*Id.*  Dr. Cohen's impression was "[d]iffuse lower extremity weakness in the presence of normal electro

physiologic studies."  *Id.*  He suggested a number of explanations, including: a lower neuron process

disorder, an antalgic syndrome "since movement causes uncomfortable parasthesias," and an

inflammatory disorder.  R 221-22.  He recommended further testing and a follow-up appointment with

Dr. Cohen and himself.  R. 222.  Schuster did not return to the Mayo clinic.

On December 10, 2003, Schuster was admitted to the Holmes Regional Medical Center

hospital with palpitations, shortness of breath, and a rapid heart rate.  R. 261-77.  The doctors assessed

supraventricular tachycardia "aborted with adenosine" and a history of hypothyroidism.  R. 263.

Schuster was discharged on December 11, 2003.  *Id.*  Upon referral from Dr. Nunes, Schuster visited

cardiologist James Zavitsanos, M.D., on December 17, 2003, who assessed a history of

supraventricular tachycardia, and recommended that Schuster continue beta blocker therapy.  R. 366.

On February 8, 2004, Schuster visited Dr. Nunes with complaints of pain in her back and legs

as well as severe fatigue.  R. 362-63.  On examination, Dr. Nunes observed that Schuster's strength

was 5/5 with a normal gait, but that she had limited range of motion with an inability to abduct her

upper extremities level with her shoulder.  R.362.  Schuster also displayed reduced range of motion

of her hips, mild swelling of the digits of her hands and feet, and numbness over her right thigh with

mildly diminished sensation.  *Id.*  Dr. Nunes's impression was possible lupus or connective tissue

disease, intermittent palpitations, hypothyroidism, and "Questionable spinal stenosis versus

radiculopathy."  *Id.*  He opined: "Presently she is nearly disabled from the above condition, unable to

-13-

perform her routine activities of daily living because of the severe arthralgias and myalgias and fatigue." R. 363.  Dr. Nunes further diagnosed depression, and prescribed Effexor.  *Id.*

On March 17, 2004, Schuster saw Dr. Nunes for a follow-up appointment.  R. 360-61.  In his notes, under "History of Present Illness," Dr. Nunes noted that Schuster "has been tried on multiple modalities of therapy including anti[-]inflammatory medicines, pain medications, muscle relaxants and physical therapy without any significant improvement." R. 360.  Dr. Nunes also stated that Schuster continued to complain of weakness, pain, and fatigue, and that "[s]he is essentially disabled from this, as she is only able to walk for short distances." *Id.*  His physical examination was mostly normal, with normal gait and strength in her extremities, but she had "mildly diminished" reflexes in her lower extremities.  *Id.*  His general impression of Schuster's "[c]omplicated case" was that "[s]he has symptoms of weakness but finding an identifiable source has been very difficult." R. 361.  He suggested possible multiple sclerosis, myositis, and ruled out peripheral neuropathy and myasthenia. *Id.*  He also assessed hypothyroidism, a Vitamin B supplement, and palpitations with tachy cardia and hypertension "well controlled on the Toprol" medication.  *Id.*

On May 11, 2003, at the request of the Office of Disability Determinations, Nitin Hate, M.D. performed a physical consultative examination.  R. 287-89.  A physical examination revealed mostly normal results.  R. 287-88.  Schuster was able to walk on her toes and heels; straight leg testing was negative; and her muscle strength was normal "in all major muscle groups." R. 288.  The doctor did observe that Schuster had an antalgic gait, diminished sensation in both legs, and absent ankle reflexes.  *Id.*  Dr. Hate's impression was "an undiagnosed neurological condition [and] pain in the back with paresthesia." R. 289.  He observed that her diagnosis of hypertrophy did not explain her

ongoing pain, and that his physical examination findings were suggestive of radiculopathy.  *Id.*  He ruled out peripheral neuropathy; noted that her condition was "unclear"; and recommended obtaining nerve conduction studies.  *Id.*  Dr. Hate further opined that Schuster "may have difficulty in strenuous activities, particularly repetitive stooping and lifting weights, and is advised against working at unprotected heights or with moving machinery.*"  Id.*

At the request of the Office of Disability Determinations, on May 20, 2004, Schuster underwent a psychological consultive examination performed by Nancy MacKay, Psy.D.  R. 293-94. In relating her medical history, Schuster stated that she had never received any outpatient psychological counseling, and denied any history of psychiatric hospitalization.  R. 294.  Schuster stated that she was prescribed Effexor for her depression, but that she was unable to tolerate the side effects.  *Id.*  On examination, Schuster's mood appeared depressed, and her affect was congruent.  *Id.* Her speech was clear and coherent, and her intellectual functioning appeared to be average.  *Id.*  Dr. MacKay observed that her "attention and concentration appear[ed] mildly impaired," as well as her recent memory.  *Id.*  Her abstract reasoning capability was "moderately impaired," and, as she demonstrated a "good level of motivation," Dr. MacKay opined that "[t]hese results are considered to be a valid estimate of her current level of functioning."  *Id.*  Dr. MacKay diagnosed "Depressive Disorder Due to A General Medical Condition" on Axis, Chronic Pain on Axis III, Psychosocial Stressors of unemployment, chronic pain, and a limitation of her activities on Axis IV, and a current GAF score of 49, with the highest GAF score in the past year of 59.[7]  *Id.*  Dr. MacKay opined that

---

[7]The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ("DSM-IV") describes the five axes included in "the DSM-IV multiaxial classification" as:

Axis I     Clinical Disorders; Other Conditions That May Be a Focus of Clinical Attention
Axis II    Personality Disorders

Schuster had symptoms of depression, but that her "[p]rimary impediment to employment appears to be physical rather than psychological." *Id.*   Dr. MacKay further opined: "From a psychological standpoint, her ability to understand, remember, and carry out directions appears moderately impaired. Pace and perseverance appear markedly impaired.  She requires assistance with some activities of daily living.  Her ability to manage the stress of a workplace environment appears moderately impaired." *Id.*

On May 28, 2004, A. Alvarez-Mullin, M.D., a non-examining state agency physician, completed a Psychiatric Review Technique form.  R. 295-308.  The physician opined that Schuster had an affective disorder, "Depressive Disorder Due to a General Medical Condition," but that her mental impairments were not severe.  R. 295, 298.  Schuster had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  R. 305.

On June 14, 2004, Nicholas Bancks, M.D., another non-examining state agency physician, updated a physical RFC assessment he had originally completed on May 20, 2004.  R. 309-16.  Dr. Bancks opined that she could lift and carry approximately twenty pounds occasionally and ten pounds frequently; and stand, walk, and sit approximately six hours in an eight-hour day.  R. 310.  Schuster

---

Axis III   General Medical Conditions
Axis IV   Psychosocial and Environmental Problems
Axis V    Global Assessment of Functioning.

The Global Assessment of Functioning ("GAF") Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF code of 51-60 indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*

was limited from repetitive pushing and pulling in her upper extremities.  *Id.*  Schuster further could frequently climb ramps and stairs, kneel, and crawl; occasionally balance, stoop, and crouch; and never climb ladders, ropes, and scaffolds.  R. 311.  She had no manipulative, visual, or communicative limitations, but she had to avoid concentrated exposure to extreme cold and heat and to hazards, such as machinery and heights.  R. 312-13.

On December 24, 2004, Reuben Brigety, M.D., an OB/GYN Specialist and a non-examining state agency physician, completed a physical RFC assessment of Schuster.  R. 278-85.  Dr. Brigety opined that Schuster could lift and carry approximately twenty pounds occasionally and ten pounds frequently; stand, walk, and sit approximately six hours in an eight-hour day; and push and pull without limitation.  R. 279.  Schuster was occasionally limited in her abilities to climb, balance, stoop, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations, except that she had to avoid concentrated exposure to hazards.  R. 280-82.

On January 19, 2005, Schuster was involved in an motor vehicle accident.  R. 334.  Schuster visited Dr. Prusinski on February 3, 2005, and reported experiencing almost constant low back pain with radiation to the hips, numbness, and tingling of her right lower extremity since the accident.  *Id.* Schuster also complained of mid-back pain, intermittent neck pain, and headaches with blurred visioin.  *Id.*  On examination, Dr. Prusinski observed diminished range of motion in the spine; bilateral sub-occipital tenderness with palpation; bilateral cervical, thoracic, and lumbar paraspinal muscle spasm with palpation.  R. 332.  Her gait and station were normal.  *Id.*  Dr. Prusinksi diagnosed post-traumatic bilateral occipital neuralgia with secondary cephalgia, cervical sprain, thoracic sprain, exacerbation of pre-existing lumbar sprain, "Rule out post-traumatic cervical and/or lumbar

-17-

radiculopathy," lumbar spondylosis, lumbar facet tropism and lumbar facet arthrosis.  R. 331-32.  He recommended application of moist heat or cold; modification of her daily activities; and continuation of her chiropractic treatment.  R. 331.

A February 19, 2005 MRI of the lumbar spine revealed "mild diffuse osteoarthritic and degenerative changes" and a straitening of the normal curvature of the spine.  R 330.  An MRI of the cervical spine from the same day showed disc bulges at C5-6, C6-7 and C4-5 "without neurologic compromise," "mild diffuse osteoarthritic and degenerative changes of the cervical spine including diffuse degenerative disc disease without significant disc volume loss," and minimal posterior osteophytes at C5-6, C6-7 and C4-5, "again without neurologic compromise."  R. 329.  A thoracic MRI showed "Multilevel Schmorl's nodes at T6-7, T7-8 and T8-9."  R. 328.  Electromyography and Nerve Conduction Studies performed on March 16, 2005 and April 6, 2005 were normal.  R. 320-22, 324-26.

Schuster returned to Dr. Nunes on March 22, 2005.  R. 352-53.  Dr. Nunes assessed hypothyroidism that was well-controlled on medication, connective tissue disease ("[s]uspect underlying lupus or a mixed connective tissue disease), arrhythmia, acid reflux disease, chronic back and leg pain (for which Schuster was to continue to take Neurontin medication).  R. 353. Dr. Nunes further stated: "I have filled out forms today for her continued disability.  Because of her underlying connective tissue disease mainly, she is unable to procure any meaningful employment, has chronic pains with prolonged sitting, standing.  She is weak and unable to lift without pain more than about 10 pounds."  *Id.*

Throughout 2005, Schuster continued treatment with Dr. Prusinski and Dr. Nunes, who both continued to prescribe medication and reported no significant changes.  R. 425-31, 433-39.  On August 25, 2005, Dr. Nunes wrote a letter to the Hartford Insurance Group in which he stated:

> The contention has been that [Schuster] has an underlying connective tissue disease that has caused a progressive disability making it unable for her, due to profound malaise, fatigue, chronic pain and weakness, to perform a job.  It takes most all of her effort just to perform her activities of daily living[,] many of which she has a hard time doing at her present level of functionality.  I do not suspect any underlying malingering in this patient, however, if you are considering rejecting her disability then I would advise you to seek consultation with a rheumatologist prior to any such action.  It is a very difficult situation as all of her complaints are purely subjective . . . [T]here is no objective test . . . that would predict the course, extent of the disease or the severity of the symptoms.  This makes your job in determining her disability extremely difficult.

R. 351.

On October 28, 2005, Dr. Nunes diagnosed depression, and prescribed Zoloft, noting that she "did not tolerate the Cymbalta at all."  R. 433.  Dr. Nunes also stated that Schuster continued to "have problems with her connective tissue disease, chronic arthralgias, fatigue and chronic pain."  *Id.*  In addition, Schuster submitted notes from her chiropractic physician, Dr. Richard Berthiaume.  R. 383-422, 440-515.  Schuster received regular chiropractic treatment for her pain from 2003 through 2005.

**B.     THE ANALYSIS**

**1.     Treating Physicians**

Schuster argues that the ALJ erred by rejecting the opinions and findings of Dr. Nunes, a treating physician, when assessing Schuster's RFC.  The Commissioner responds that Dr. Nunes' "opinion" was "explicitly based on subjective complaints" and was "not consistent with the rest of the record," and that the ALJ therefore properly rejected Dr. Nunes' "opinion."  Doc. No. 10 at 6, 9.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

In this case, the ALJ mentioned two statements by Dr. Nunes: (1) the doctor's February 2004 treatment note, in which he opined that Schuster was "nearly disabled" and "unable to perform her routine activities of daily living," and (2) Dr. Nunes' August 2005 letter to the Hartford Insurance Group, which the ALJ summarized as "stating [that Schuster] was unable to work." R. 15. The ALJ then observed: "Statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the Social Security statutes, a task assigned solely to the discretion of the Commissioner. These statements [of Dr. Nunes] are conclusive as to the ultimate question of disability . . ." *Id.* The ALJ then summarily rejected the "opinion" of Dr. Nunes "in face of persuasive contrary evidence and unsupported conclusions." *Id.*

This cursory examination of Dr. Nunes' statements, opinions, and findings – all of which were made during Dr. Nunes' two-year treatment of Schuster – is wholly insufficient. First, the ALJ's statement of the relevant regulations and social security rulings is not entirely accurate. The ALJ is

-20-

correct that certain issues, including the claimant's RFC and whether the claimant is disabled <u>under the Act</u>, are reserved for the Commissioner, and that a treating source's opinions on these issues are not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). The regulations nonetheless also require more careful consideration than a summary rejection of the treating source's statements. In fact, Social Security Ruling 96-5p requires that the Commissioner "always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner" and that the Commissioner "make every reasonable effort to recontact [treating sources] for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear . . ." SSR 96-5p.

In addition, the regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a), 416.927(a). The regulations further recognize that treating sources' opinions about the nature and severity of the claimant's impairments are entitled to special significance and often entitled to controlling weight. *See* SSR 96-2p, 96-6p. A medical opinion is not *necessarily* reserved for the Commissioner simply because it addresses a similar issue to what the Commissioner must address. Rather, the distinction is that "[m]edical source statements are based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual" and an "RFC Assessment," which is reserved for the Commissioner, is "based upon consideration of all relevant evidence in the case record . . ." SSR 96-5p.

Accordingly, the ALJ did not consider and weigh all of Dr. Nunes' opinions and findings, some of which *were* entitled to controlling weight. For example, in March 2005, Dr. Nunes opined that Schuster had "chronic pain with prolonged sitting, standing" and that Schuster was "weak and unable to lift without pain more than about 10 pounds." R. 353. The ALJ did not state sufficient reasons (or any reason) for his failure to assign controlling weight to these opinions, and remand is required for further consideration and evaluation of Dr. Nunes' opinions and findings.

Additionally, the Court observes that: (1) the ALJ failed to state the weight he assigned to Dr. MacKay's opinions,[8] including her assignment of a low GAF score and her statements that Schuster had some moderate or marked impairments due to her depressive disorder (R. 294); and (2) the ALJ confusingly made three different statements that could be interpreted as three different RFC findings (as detailed above) (*see* R. 15, 17-18, Findings 7, 12). Therefore, on remand, the Commissioner shall also further clarify and make consistent the findings as to Schuster's RFC and state with particularity the weight given to all of the medical opinions and the reasons therefor.

## 2.      Credibility

Schuster also challenges the ALJ's credibility finding, arguing that the ALJ did not follow Social Security Ruling 96-7 when assessing Schuster's subjective complaints. Doc. No. 9 at 13-15. The Commissioner counters that "there are blatant conflicts between [Schuster's] complaints and the evidence." Doc. No. 10 at 7-10.

---

[8]The ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.   20 C.F.R. § 404.1529.   Social Security Ruling 96-7, in providing clarification of 20 C.F.R. § 404.1529, describes a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . . [and]
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.

SSR 96-7p.

In addition to applying the relevant regulations and agency rulings, when evaluating pain in this Circuit, the ALJ must apply the United States Court of Appeals for the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).   Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.   *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).

In this case, the ALJ's credibility finding is also cursory. *See* R. 14.[9]  The ALJ did not clearly apply the Eleventh Circuit's pain standard nor the standard detailed in Social Security Ruling 96-7p. Further, without knowing the weights assigned to all of the different medical opinions, it is not clear that substantial evidence supports the ALJ's credibility finding.   Remand is required for further evaluation and explanation on this issue.

## V.     **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is reversed and remanded pursuant to sentence four of 52 U.S.C. § 405(g) to allow the Commissioner to reevaluate the evidence, to explain the basis for his decision, and to hold such further proceedings as he may be advised.  The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 17th day of August, 2007.

*Donald P. Dietrich*
DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

---

[9]In making his credibility finding, the ALJ merely stated that Schuster's epidural injections were helpful; that her palpitations were well-controlled on medication; that "[s]he alleges unrelenting fatigue but does not require prescription stimulants"; that she has never seen a psychologist or a psychiatrist for her affective disorder; and that "[t]he lack of treatment she has received is inconsistent with the level of symptoms she alleges and reflects poorly on her credibility." R. 15.  The Court observes that these statements are a poor reflection of the record as a whole, and that lack of treatment due to the inability to *cure* the pain is not necessarily a sufficient reason for rejecting a claimant's complaints of pain.  *See Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988) (noting that no examining physician had ever questioned the existence of the claimant's pain; that the doctors instead were unable to cure the pain; and that "[s]urely, the [Commissioner] did not mean to suggest that lack of a cure or relieving treatment obviates the existence of pain produced by the condition.")

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth SR.eet, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Arthur L. Conover
Adminitrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817